UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JOSHUA A LAPIN<br><br>Plaintiff,<br><br>vs.<br><br>EVERQUOTE INC, a/k/a EverQuote, and JOHN DOE SENDER, d/b/a BuzzBarrelReview.com, d/b/a dzlosurverys.com, d/b/a emailsjobsdelivered.com, d/b/a Entirelybelieve.com, d/b/a JobsDeliver.com, d/b/a expectcarecare.com, d/b/a JobSharkNL.com, d/b/a NationalShopperSurvey.com, d/b/a NationalSurveysOnline.com, d/b/a exigentmediagroup.com, d/b/a enrichedtechnologies.com, d/b/a ConsumerDigitalSurvey.com, d/b/a drivingmarketinggroup.com, d/b/a surveyandgetpaid.com, d/b/a tummyheadmediagroup.com, d/b/a thebestcreditcheck.com, d/b/a thefreetree.co, d/b/a dlzoffers.com, d/b/a nationaldigitalsurvey.com, d/b/a dealzingo.com, d/b/a rumorfox.com,<br><br>Defendants. | 4:22-CV-04058-KES<br><br>ORDER DISMISSING LAPIN'S CLAIMS AGAINST DEFENDANT EVERQUOTE AND DENYING LAPIN'S MOTION TO RECONSIDER |

Pending before the court is defendant EverQuote's motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim under Rule 12(b)(6). Docket 13. EverQuote also argues a federal statute preempts, plaintiff, Joshua A Lapin's, state-law claims. Docket 14 at 2-3.  Lapin resists these arguments. Docket 19. Lapin also moves the

1

court to reconsider its previous order denying him the ability to file documents electronically. *See* Docket 11; Docket 18.

## FACTUAL BACKGROUND

Lapin alleges the following:

Lapin is a full-time traveling "digital nomad" who moves from place to place, generally internationally, in 30-day cycles, without a permanent residence in or out of the United States. *See* Docket 1 ¶ 2. Lapin received 108 commercial emails advertising auto insurance. *See id.* ¶¶ 5-7. Lapin alleges defendant "John Doe Sender" sent some of these emails to Lapin but does not know the identity of the other senders of the emails. *See id.* ¶¶ 9, 29. Lapin acknowledges EverQuote did not send these emails, but alleges EverQuote is the advertiser featured in them. *Id* ¶ 28.

EverQuote has its principal place of business in Massachusetts and is incorporated in Delaware. *Id.* ¶ 3. EverQuote "is in the business of generating [auto] insurance leads for [auto] insurance companies. *Id.* It is registered to do business in the State of South Dakota and has a registered agent in South Dakota. *See id.* ¶ 40, 45. On its website, it advertises South Dakota specific auto insurance, detailing the state's requirements. *See id.* ¶ 40

Lapin alleges 108 claims against John Doe Sender and EverQuote for various violations of SDCL § 37-24-47. For example, Lapin alleges some of the emails have a third-party domain name without the third-party's permission. Docket 1 ¶ 28. Lapin also alleges that some of the emails' header information is misleading or false because some of the emails have untraceable domain

names and some of the "to" field in the emails incorrectly indicate Lapin's email. *Id.* ¶ 29. He further alleges the "from" fields of the emails he received improperly failed to identify EverQuote as the advertiser of the emails and failed to identify the senders of the emails. *Id.* ¶ 30. Based on these alleged violations, Lapin seeks the statutory liquidated damages amount of $1,000 per email, as well as reasonable costs associated with filing and maintaining this action and for service of process. *See* Docket 1 ¶ 37; SDCL § 37-24-48.

## DISCUSSION

The court first considers whether it has personal jurisdiction over EverQuote, because without personal jurisdiction, the court lacks authority over the defendant. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999)("[J]urisdiction generally must precede merits in dispositional order[.]"); *Kangas v. Kieffer*, 495 Fed.App'x. 749, 750 (8th Cir. 2012) ("A court may not resolve a case on its merits unless the court has jurisdiction over both the claims and the parties in suit.").

## I.    Personal Jurisdiction

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must plead 'sufficient facts to support a reasonable inference that the defendant[ ] can be subjected to jurisdiction within the state.' " *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (quoting *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (alteration in original)). The plaintiff bears the burden to prove the court has personal jurisdiction. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820

(8th Cir. 2014). The court must view the evidence in the light most favorable to the plaintiff and resolve factual conflicts in the plaintiff's favor. *Id.*

"A federal court may assume jurisdiction over a defendant in a diversity action if the forum State's long-arm statute permits the exercise of personal jurisdiction and that exercise is consistent with the Due Process Clause of the Fourteenth Amendment." *Creative Calling*, 799 F.3d at 979. South Dakota's long-arm statute confers jurisdiction to the fullest extent allowed by the Due Process Clause, and thus the court need only determine whether the assertion of personal jurisdiction comports with due process under the Fourteenth Amendment. *See* SDCL § 15-7-2(14); *see also Larson Mfg. Co. of S.D. v. Conn. Greenstar, Inc.*, 929 F. Supp. 2d 924, 926 (D.S.D. 2013) (citing *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 915 (8th Cir. 1994)).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from exercising personal jurisdiction over a nonresident defendant unless that defendant has "minimum contacts" with the state such that maintaining the lawsuit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The court must consider five factors to evaluate whether a defendant's actions sufficiently support personal jurisdiction:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) [South Dakota]'s interest in providing a forum for its

> residents; and (5) the convenience or inconvenience to
> the parties.

*Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012). The third factor

distinguishes between specific and general jurisdiction. *Johnson v. Arden*, 614

F.3d 785, 794 (8th Cir. 2010).

The first three factors carry significant weight, while the final two are less

important. *See Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1074 (8th Cir.

2004). The court should not mechanically apply the test, as this determination

"is not readily amenable to rigid rules that can be applied across the entire

spectrum of cases." *Viasystems, Inc., v. EBM-Papst St. Georgen GmbH & Co.,*

*KG*, 646 F.3d 589, 596 (8th Cir. 2011) (quoting *Anderson v. Dassault Aviation*,

361 F.3d 449, 452 (8th Cir. 2004) (internal quotations omitted)).

Here, Lapin admits that there is no general personal jurisdiction, so the

court need only determine whether the court can exercise specific jurisdiction

over EverQuote. *See* Docket 19 at 2. For a court to exercise specific jurisdiction

over the defendant, there must be a relationship between the forum, cause of

action, and the defendant. *Helicopteros Nacionales de Columbia, S.A. v. Hall*,

466 U.S. 408, 414 (1984). The defendant must purposefully direct its activities

towards the forum state. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014).

Lapin argues that the court has jurisdiction over EverQuote based on the

stream of commerce theory. *See* Docket 19 at 4-5. The Eighth Circuit has

explained that "[p]ersonal jurisdiction may be found where a seller uses a

distribution network to deliver its products into the stream of commerce with

the expectation that the products will be purchased by consumers in the forum state." *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 694 (8th Cir. 2003). The stream of commerce analysis does not replace the five-factor test, but instead is "an overlay through which the five factors, or constitutional due process, may be viewed." *Estate of Moore v. Carroll*, 159 F.Supp. 3d 1002, 1012-13 (D.S.D. 2016) (collecting Eighth Circuit cases).

Before further discussing the stream of commerce doctrine, the court will address whether this doctrine is applicable to the instant case. Lapin's cause of action is not a products liability case. *See* Docket 1. Instead, Lapin claims violations of a state law that imposes certain requirements on commercial e-mail advertisements. *See* SDCL § 37-24-47. Lapin argues that EverQuote is an advertiser under § 37-24-41(1), and that EverQuote placed its e-mail advertisements with various senders (John Doe or "various unknown senders") who then sent them in violation of § 37-24-47. Docket 1 ¶¶ 29, 35. Essentially, he argues that EverQuote is like a manufacturer who places its product with a distributor, who then distributes the product.

At first glance, the stream of commerce analogy seems inept here, because according to Lapin, the actual advertisement that EverQuote placed in the stream of commerce is not itself the "defective product." In other words, under Lapin's theory, the bodies of the emails do not themselves violate SDCL § 37-24-47, but rather the *way* the senders sent the advertisements to him forms the basis for liability. *See* Docket 1 ¶¶ 29, 35 (describing the violations as rooted in the misleading "To" and "From" domains of the emails sent by

6

either Doe or various unknown senders). Thus, applying the stream of commerce doctrine to this situation may appear akin to applying it to a case where the plaintiff sues a defendant manufacturer of a product, not because the product was defective per se, but because its seller misled the plaintiff regarding the product's price. Indeed, "[c]ourts typically do not extend the stream of commerce theory beyond the products liability context or beyond a dispute pertaining to the actual product." *Guinness Import Co. v. Mark VII Distribs., Inc.*, 971 F.Supp. 401, 409 (D. Minn. 1997), *aff'd*, 153 F.3d 607 (8th Cir. 1998).

But here, under South Dakota law, an advertiser is liable for its email advertisements. *See* SDCL §§ 37-24-41, 37-24-47. Under SDCL § 37-24-41(a), South Dakota defines "advertiser" as "a person or entity that advertises through the use of commercial e-mail advertisements[.]" Under SDCL § 37-24-47, the law sets forth the circumstances in which commercial e-mail advertisements are prohibited, and states, "[n]o person may *advertise* in a commercial e-email advertisement either sent from South Dakota or sent to a South Dakota electronic mail address under any of the [listed] circumstances[.]" Considering these provisions together, because the law expressly contemplates an advertiser as a person or entity who advertises through commercial e-mails and because the prohibition of certain e-mail advertisements applies to any person who "advertise[s] in a commercial e-mail advertisement," it follows that South Dakota has deemed the advertiser liable

7

for its commercial e-mails, even if the advertiser is not the one who sent the emails.

It may be true that this case does not look like the traditional case to which courts typically apply the stream of commerce analysis. *See Guinness*, 971 F.Supp. at 409. But the Eighth Circuit has repeatedly explained that courts should not mechanically apply personal jurisdiction tests, nor can the analysis be rigid. *See, e.g., Viasystems,* 646 F.3d at 596; *Pangaea, Inc., v. Flying Burrito LLC,* 647 F.3d 741, 746 n.4 (8th Cir. 2011); *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d 1338, 1340 (8th Cir. 1983) (noting that the five factors "do not provide 'a slide rule by which fundamental fairness can be ascertained with mathematical precision.' " (quoting *Toro Co. v. Ballas Liquidating Co.*, 572 F.2d 1267, 1270 (8th Cir. 1978)). South Dakota's law makes advertisers liable for non-compliant e-mail advertisements, even if the advertisers themselves are not the one who sent the emails. Thus, just as a manufacturer places a defective product into a stream of commerce with a distributor, and such products eventually make their way to an end-user who can sue the manufacturer for any defects, advertisers of commercial emails place its emails into the stream of commerce with various senders, who then send out such advertisements to recipients who can sue such advertisers for non-compliant emails. The court finds it appropriate to analyze personal jurisdiction using the stream of commerce theory.

The court now turns to this theory of personal jurisdiction. In *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295-96 (1980), the Supreme

8

Court held that the mere fact that a defendant can foresee the potential for a plaintiff suffering an injury in the forum state is insufficient to establish personal jurisdiction. There, the Court found that an Oklahoma court could not exercise personal jurisdiction over a New York-based automobile retailer and its wholesale distributor when the defendants' only connection to Oklahoma was "the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma." *Id.* at 287, 295. The Court concluded that the relevant inquiry is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297.

Following *Worldwide Volkswagen*, the Supreme Court again addressed the stream of commerce doctrine in *Asahi Metal Ind. Co., Ltd. v. Superior Court of California, Solano Cty.*, 480 U.S. 102 (1987). The court found that a California state court did not have personal jurisdiction over a Japanese manufacturer, but the Court was "sharply divided" about the applicability of the stream of commerce theory. Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1067.4 (4th ed. 2022). In Justice O'Connor's opinion joined by three other justices, she opined that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State[,]" but rather some "[a]dditional conduct" indicating "an intent or purpose to serve the market in the forum State" was also necessary. *See Asahi*, 480 U.S. at 112. This "additional conduct" may

9

include "an intent or purpose to serve the market in the forum State" such as "designing the product for the market in the forum State[.]" *Id.*

Justice Brennan's concurrence, joined by three others, ultimately agreed with Justice O'Connor in finding that a California state court lacked personal jurisdiction over the Japanese manufacturer, but did not agree with Justice O'Connor's stream of commerce discussion. *See id.* at 116-17, 121. Justice Brennan argued that "[a]s long as a participant . . . is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise[,]" and thus Justice Brennan rejected the idea that there must be a showing of additional conduct. *See id.*

Finally, Justice Stevens wrote a concurrence in which he argued the stream of commerce discussion was unnecessary to decide the case, and that the court should consider "the volume, the value, and the hazardous character" of the product in question. *See id.* at 121-22. Thus, Justice Stevens did not join either Justice O'Connor's or Justice Brennan's view on the correct approach to a stream of commerce analysis.

Most recently in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), the Supreme Court again failed to present a clear majority view on how to approach a stream of commerce analysis. In *Nicastro*, the plaintiff sued a British manufacturer in New Jersey after the plaintiff injured himself using the manufacturer's metal-shearing machine. *See id.* at 878 (Kennedy, J. plurality). The British manufacturer had attended annual trade conventions in the United States, but it had never attended one in New Jersey. *Id.* Justice Kennedy,

10

writing for a four-member plurality, found that although the manufacturer "directed marketing and sales efforts at the United States[,]" it had not "purposefully directed" conduct at New Jersey. *See id.* at 886. Justice Kennedy characterized personal jurisdiction as a function of the "power of a sovereign" to resolve disputes and enter judgments, and thus opined that "[t]he principal inquiry . . . is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *See id.* at 882. Thus, Justice Kennedy opined that New Jersey lacked personal jurisdiction over the case. *Id.* at 887.

Justice Breyer, joined by Justice Alito, agreed that the New Jersey court lacked personal jurisdiction, but rejected Justice Kennedy's approach as being too rigid in light of modern-day advances in the economy. *See id.* at 887, 890 (Breyer, J. concurring). Justice Breyer instead focused on the fact that the record showed no regular course of sales in New Jersey, and that there was not "something more" than just the mere foreseeability of the product ending up in New Jersey, such as "special state-related design, advertising, advice, marketing, or anything else." *See id.* at 888-89.

Justice Ginsburg, joined by Justices Sotomayor and Kagan, dissented, and argued New Jersey did have personal jurisdiction over the manufacturer because the manufacturer had purposefully targeted the entire United States market, and thus New Jersey was not a random place of adjudication, but rather "a result of the U.S. connections and distribution system that [the manufacturer] deliberately arranged." *See id.* at 893, 898 (Ginsburg, J. dissenting). Justice Ginsburg concluded that because its actions targeted the

United States, it purposefully availed itself to the United States and thus it would be fair to subject it to personal jurisdiction in New Jersey. *See id.* at 905. After reviewing these cases, the court notes that at least a majority of justices have agreed—twice—that knowledge that a product placed in the stream of commerce could end up in a forum state plus "something else" is sufficient to confer on the forum state court personal jurisdiction. *See Asahi*, 480 U.S. at 112, 116-17, 121; *Nicastro*, 564 U.S. at 888-890, 898, 905.

Here, Lapin's submissions show that EverQuote specifically markets "Cheap Car Insurance in South Dakota" and provides specific auto insurance requirements in South Dakota. *See* Docket 1 ¶ 40. Additionally, Lapin alleges, and EverQuote implicitly concedes, that EverQuote is registered to do business in South Dakota and maintains a registered agent in South Dakota. *See* Docket 1 ¶¶ 40, 45; Docket 21 at 10-11 (contesting only the *significance* of EverQuote having a registered agent in South Dakota). EverQuote had every reason to believe its email advertisements would end up in South Dakota, because it purposefully marketed its product on its website for South Dakota specific car insurance and registered itself as a business in South Dakota. Because it purposefully availed itself to do business in South Dakota, the court finds EverQuote has minimum contacts with South Dakota under a stream of commerce analysis.

The Eighth Circuit's decision in *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610 (8th Cir. 1994) supports this conclusion. In *Barone*, the court held that the state of Nebraska could exercise specific personal

12

jurisdiction over a foreign fireworks manufacturer, when the manufacturer sold its fireworks to local distributors who later sold the fireworks in Nebraska. *See id.* at 611-13, 15. In doing so, the court emphasized that the manufacturer "certainly benefited from the distribution efforts" and that "[m]ore than reasonable foreseeability is at stake here[,]" because the manufacturer "purposefully reaped the benefits of . . . Nebraska's [laws][.]" *See id.* at 613, 15.

Here, EverQuote's position is similar to the foreign fireworks manufacturer in *Barone*: EverQuote placed its advertisements with various senders, knowing (or at the very least EverQuote should have known) that its advertisements would be read in South Dakota. Because EverQuote has specifically tailored its insurance information to South Dakota residents and registered itself to do business in South Dakota, it has "purposefully reaped the benefits of . . . [South Dakota]'s [laws][.]" *See id; see* Docket 1 ¶¶ 40.

EverQuote resists this conclusion for several reasons. First, EverQuote argues that Lapin cannot properly identify the party who sent the commercial e-mails to him. *See* Docket 21 at 8-9. EverQuote points out that Lapin did not name the sender of the emails in his original complaint, nor seek to amend his complaint, and thus the court should "disregard" the new allegations in Lapin's response (Docket 19) about Flex Marketing Group LLC being the real identity of "John Doe." *See* Docket 21.

The court need not consider Lapin's new allegations about Flex Marketing Group LLC, because Lapin's allegations in his original complaint are sufficient for the court after considering all reasonable inferences in favor of

13

Lapin. *See Fastpath*, 760 F.3d at 820. This is especially the case given that Lapin filed this case pro se. *See Erickson v.* Pardus, 551 U.S. 89, 94 (2007). Here, Lapin alleged that EverQuote is "in the business of generating [auto] insurance leads for [auto] insurance companies" (alterations in original). Docket 1 at 2. He also alleged that EverQuote was the ultimate advertiser of the commercial emails he received. *Id.* at 175. Although he alleged he does not know the identities of the sender, the court finds it reasonable to infer that regardless of who actually sent the emails, EverQuote enlisted some entity to do so. If EverQuote did not send the emails, someone had to have, and that someone would not have had access to EverQuote's advertisements except for EverQuote giving them the access. Thus, the court rejects EverQuote's first argument that suggests the court must know the identity of the senders of these emails.

EverQuote next cites to a Tenth Circuit decision, *XMission, L.C. v. Fluent LLC*, 955 F.3d 833 (10th Cir. 2020), arguing it is a "strikingly similar case" that requires the court to find allegations that EverQuote targeted South Dakota to fail. Docket 21 at 10. In *XMission*, the defendant, Fluent, was an internet service provider who provided email hosting services. *See* 955 F.3d at 837. The plaintiff alleged that Fluent had sent over 10,000 emails to customers in the forum state, all in violation of the CAN-SPAM Act, 15 U.S.C. §§ 7701 to 7713; 18 U.S.C. § 1037, which is the same federal law EverQuote alleges preempts Lapin's instant case. *See XMission*, 955 F.3d at 837. But unlike here, the court in *XMission* noted that the defendant had never been registered to do business

14

in the forum state, nor had it "undertaken to market or advertise in [the forum state] or to target or direct any internet marketing directly to [the forum state] residents." *See id.* at 838. Additionally, because Xmission merely sent emails to a national audience rather than advertised in its emails, the court did not engage in a stream of commerce type analysis. *See id.* at 841-50. Thus, *XMission* is distinguishable and does not alter the court's analysis.

The decision in *Toro Co. v. Advanced Sensor Tech., Inc.*, No. 08-248, 2008 WL 2564336 at *3-4 (D. Minn. June 25, 2008) similarly does not alter the court's decision. In *Toro*, the plaintiff, The Toro Company, sued Advanced Sensor Technology, Inc. (AST), for false advertising, deceptive trade practices, consumer fraud, and intentional interference with prospective economic advantage. *See id.* at *1. Toro argued that AST had maintained a website that was accessible to the forum state and sent over 300 emails to individuals in Minnesota as part the defendant's nationwide email distribution list, and thus had sufficient minimum contacts to justify personal jurisdiction. *See id.* at *3. The court rejected this argument, observing that AST had not targeted these emails specifically to Minnesota. *See id.* at *3-4. Furthermore, the court in *Toro* did not discuss anything about AST marketing its products specifically to Minnesota residents. The facts in *Toro* did not readily bring up a stream of commerce analysis, and thus the court did not conduct one. *See id.* at *3-4. Here, unlike in *Toro*, EverQuote specifically marketed its auto insurance to South Dakota residents on its website. It placed its advertisements with senders, hoping and knowing the emails would reach South Dakota residents.

15

Furthermore, the court views this case through a stream of commerce lens, distinguishing it from *Toro.* Thus, *Toro* does not aid Everquote in this case.

Having concluded there is sufficient minimum contacts, the court now considers whether Lapin's case "arise[s] out of or relate[s] to" such contacts. *See Myers*, 689 F.3d at 912 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). The "arise out of or relate to" requirement is met if "the defendant purposefully directs its activities at the forum state and the litigation 'result[s] from injuries . . . *relating* to [the defendant's] activities [in the forum state].' " *Id.* at 913 (emphasis added) (alt. in original) (quoting *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008)). This requirement is "flexible" based on the totality of circumstances. *See id.; K-V Pharm.*, 648 F.3d at 592-93. It does not require proximate causation between the contacts and the cause of action. *Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 913 (8th Cir. 2014).

Here, Lapin's action is based on e-mail advertisements that EverQuote placed into the stream of commerce and that advertise auto insurance. *See, e.g.*, Docket 1 at 5-40; 42-118.[1] Although the e-mail advertisements do not address South Dakota specific car insurance, EverQuote markets South Dakota car insurance on its website. *See* Docket 1 ¶ 40. Thus, the court finds Lapin's claims to be sufficiently related to EverQuote's contact with South Dakota.

---

[1] For purposes of clarity, the court cites the page numbers rather than paragraph numbers in this citation because Lapin's complaint inadvertently has two paragraph 6's, 7's, and 8's, and these e-mail advertisements are located in these paragraphs.

EverQuote argues that the existence of EverQuote's registered agent in South Dakota is insufficiently related to Lapin's instant claims. *See* Docket 21 at 10-11. But this observation does nothing to undermine the inherent connection between EverQuote's targeted advertising on its website for South Dakota specific car insurance and its commercial emails advertising car insurance. And as the Eighth Circuit has observed, the "relating to" prong of specific personal jurisdiction does not require proximate causation, but rather a flexible inquiry based on the totality of the circumstances. *See Myers*, 689 F.3d at 912; *K-V Pharm.*, 648 F.3d at 592-93; *Downing*, 764 F.3d at 913.

In summary, the court concludes that the first three—and most important—factors of the personal jurisdiction test support a finding of personal jurisdiction: the nature and quality of the contacts with the forum state, the quantity of those contacts, and the relationship of those contacts with the cause of action, all counsel in favor of finding personal jurisdiction. *See Myers*, 689 F.3d at 911; *Dever*, 380 F.3d at 1073-74. As discussed above, the stream of commerce theory explains the nature and extent of EverQuote's purposeful availment of South Dakota's market. And the court finds these contacts sufficiently related to Lapin's cause of action in this case.

The court also considers the fourth and fifth factors. The fourth factor requires the court to consider South Dakota's interest in providing a forum for its residents, and the fifth factor requires the court to consider the convenience or inconvenience to the parties. *See Myers*, 689 F.3d at 911. The fourth factor cuts in favor of personal jurisdiction, because South Dakota's laws regulating

17

commercial e-mails, and specifically providing for private causes of action, show that South Dakota has a legitimate interest in providing a forum for its residents to litigate these claims. *See* SDCL §§ 37-24-47; 37-24-48. The fifth factor does not support a finding of personal jurisdiction, given that neither Lapin nor EverQuote are based out of South Dakota. *See* Docket 1 ¶ 2 (showing Lapin describes himself as a "full-time traveling 'digital nomad[,]' who moves from place to place, generally internationally, in 30-day cycles, without a permanent residence in or out of the United States[.]"); Docket 15 at 2 ("EverQuote is incorporated in the State of Delaware, with a principal place of business in Cambridge, Massachusetts."). But although EverQuote is not based out of South Dakota, it nonetheless is registered to do business in South Dakota and thus the court finds it is not overly burdensome for it to litigate a claim here.

Based on these five factors and the above-discussion, the court concludes that Lapin has made a sufficient showing that the court has personal jurisdiction over EverQuote. The court also finds that exercising personal jurisdiction over EverQuote is fundamentally fair, because as explained above, EverQuote has purposefully availed itself of South Dakota's market by placing e-mail advertisements with various senders, knowing and hoping those emails would reach South Dakota residents, specifically by advertising its car insurance options to South Dakota drivers, and by having a registered agent in South Dakota. *See Burger King*, 471 U.S. at 477-78 (noting personal jurisdiction inquiry requires fairness to out-of-state defendant). Thus,

18

the court denies EverQuote's Rule 12(b)(2) motion for lack of personal jurisdiction. The court now evaluates EverQuote's Rule 12(b)(6) motion for failure to state a claim.

## II.   Failure to State a Claim

EverQuote moves under Federal Rule of Civil Procedure 12(b)(6) for dismissal because Lapin failed to state a claim. Under Rule 12(d) "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. Proc. 12(d); *see also Sorace v. United States*, 788 F.3d 758, 767 (8th Cir. 2015).

Ordinarily, when a district court decides to treat a Rule 12(b)(6) motion as a summary judgement motion, the court must "notify litigants . . . so that the litigants may respond to the issue the court is weighing." *Layton v. United States*, 919 F.2d 1333, 1335 (8th Cir. 1990). But *Van Leeuwen v. U.S. Postal Service*, 628 F.2d 1093, 1095 (8th Cir. 1980), provides an exception to this general rule: when both parties "submit[] outside the pleadings affidavits and exhibits which [the non-moving party] underst[ands] that the District Court accept[s] for consideration," then the district court is not required to give notice to the parties. That is because the parties were "possibly on constructive notice that the court would treat the motion as one for summary judgment." *Simes v. Huckabee*, 354 F.3d 823, 826 n.2 (8th Cir. 2004).

Here, both Lapin and EverQuote attached affidavits for the court to consider when determining whether Lapin failed to state a claim. *See* Docket

16, 17, and 20. Thus, both were on constructive notice that the court will treat it as a motion for summary judgment.[2]

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and also identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment "must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik*

---

[2] The court recognizes Lapin is *pro se* and thus realizes these complicated procedural moves are not as readily understandable to him. As the court will more fully explain, the court does not need to rely on any of EverQuote's affidavits in deciding this issue, and thus only relies on the affidavit and exhibits Lapin submitted in Docket 20.

47 F.3d at 957. It is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

South Dakota law governs Lapin's substantive legal claims, and the court is bound by the decisions of South Dakota's Supreme Court when interpreting South Dakota law. *See Progressive Northern Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010). If the South Dakota Supreme Court has not decided an issue, the court must attempt to predict how the South Dakota Supreme Court would resolve the issue. *See id.*

Lapin sues EverQuote in 108 counts under SDCL § 37-24-47 and § 37-24-48. Docket 1. SDCL § 37-24-47 provides:

> No person may advertise in a commercial e-mail advertisement either sent from South Dakota or sent to a South Dakota electronic mail address under any of the following circumstances:
>
> > (1) The e-mail advertisement contains or is accompanied by a third-party's domain name without the permission of the third party;
> >
> > (2) The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information;
> >
> > (3) The e-mail advertisement has a subject line that a person knows would be likely to mislead a

> recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

SDCL § 37-24-48 provides a private cause of action for individuals who receive emails that violate SDCL § 37-24-47. EverQuote argues that Lapin cannot succeed in his claims because the statute only applies if the commercial e-mail advertisement was "sent to a South Dakota electronic mail address[,]" and Lapin's email is not a "South Dakota electronic mail address." *See* SDCL § 37-24-47; Docket 14 at 6. South Dakota defines a "South Dakota electronic mail address" as any of following:

> (a) An e-mail address furnished by an electronic mail service provider that sends bills for furnishing and maintaining that e-mail address to a mailing address in this state;
>
> (b) An e-mail address ordinarily accessed from a computer located in this state; or
>
> (c) An e-mail address furnished to a resident of this state[.]

SDCL § 37-24-41(14). Lapin has submitted no allegations that his e-mail address is furnished by an electronic mail service provider that sends bills for furnishing and maintaining that e-mail address to a mailing address in South Dakota. *See* Docket 1. Thus, the court finds § 37-24-41(14)(a) does not apply. Lapin also has alleged that he is a "full-time traveling 'digital nomad[,]' who moves from place to place, generally internationally, in 30 day cycles, without a permanent residence in or out of the United States[.]" *See id.* at 2. Thus, the court finds § 37-24-41(14)(b) does not apply either. Lapin's ability to survive summary judgment turns on whether the court finds, construing Lapin's

22

allegations in his well-pleaded complaint as true and making any reasonable inferences from those facts in the light most favorable to him, that he can show that § 37-24-41(14)(c) applies—namely, that he is a "resident" of South Dakota.

When interpreting a statute, the South Dakota Supreme Court looks to the statute's plain language and structure. *Magellan Pipeline Co. v. S.D. Dep't of Revenue & Reg.*, 837 N.W.2d 402, 404 (S.D. 2013). The South Dakota legislature has directed that "[w]ords are to be understood in their ordinary sense" unless the statute otherwise defines a word. SDCL § 2-14-1; *see also Scheller v. Faulkton Area Sch. Dist. No. 24-3*, 731 N.W.2d 914, 916 (S.D. 2007).

Here, SDCL § 37-24-41 fails to define "resident" for purposes of determining whether Lapin has a South Dakota electronic mail address. Thus, the court turns to the ordinary sense of the word "resident." SDCL § 2-14-1. Black's Law Dictionary defines "resident" in a few ways. First, it defines a resident as "[s]omeone who lives permanently in a particular place[.]" *Resident*, BLACK'S LAW DICTIONARY (11th ed. 2019). It also defines it as "[s]omeone who has a home in a particular place[,]" and "[s]omeone who is staying in a particular hotel, apartment building, etc." *Id.* Similarly, Merriam-Webster's Collegiate Dictionary defines "resident" as "one who resides in a place." *Resident*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999). In turn, it defines "reside" as "to dwell permanently or continuously." *Reside*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999). Importantly, all of these definitions of "resident" contemplate some form of physical presence.

23

The South Dakota Supreme Court has also interpreted "resident" in the context of personal jurisdiction for divorce proceedings to require some form of physical presence, despite the relevant statute failing to define resident. *See, e.g.*, *Parsley v. Parsley*, 734 N.W.2d 813, 818 (S.D. 2007). In *Parsley*, the court had to determine whether the South Dakota trial court had personal jurisdiction over a divorce action. *See id.* The relevant statute, SDCL § 25-4-30, without defining "resident," provided "[t]he plaintiff in an action for divorce or separate maintenance must, at the time the action is commenced, be a resident of this state, or be stationed in this state while a member of the armed services." The South Dakota Supreme Court adopted a the following language about residency: "[I]t follows that the residence must be an actual residence *as distinguished from a temporary abiding place . . . .*" *Parsley*, N734 N.W.2d at 818 (emphasis added). By distinguishing actual residence from a temporary abiding place, the South Dakota Supreme Court made clear that it views residence as being the location where someone lives. The South Dakota Supreme Court affirmed this understanding in *Rush v. Rush*, 866 N.W.2d 556, 561 (S.D. 2015). In both *Parsley* and *Rush,* the court found that the relevant individuals were residents for purposes of SDCL § 25-4-30, and in both cases the individuals had significant physical presence in the state. *See Parsley*, 734 N.W.2d at 818 (individual had lived in home for over three years); *Rush,* 866 N.W.2d at 561 (individual had physically moved to South Dakota and found local employment). These two cases underscore that ordinarily, the term resident refers to where one lives.

Viewing Lapin's complaint and submissions in the light most favorable to him, the court finds that he is not a South Dakota resident. By his own admission, Lapin is a "full-time traveling 'digital nomad[,]' who moves from place to place, *generally internationally*, in 30 day cycles, without a permanent residence in or out of the United States[.]" *Docket* 1 ¶ 2 (emphasis added). He further admits, "[He] was present *physically outside of the State of South Dakota at most times material*[.]" *Id.* ¶ 38 (emphasis added). Lapin does not have any meaningful physical presence in South Dakota, and thus he is not a South Dakota resident.

Lapin resists this conclusion and instead argues that he is a legal resident of South Dakota, which he argues suffices for purposes of his claims. *See* Docket 19 at 6-9. Lapin first cites the South Dakota Department of Public Safety's Driver's License requirements for full-time travelers, which lists out the steps he had to take to get a South Dakota's driver's license. *Id.* at 7. As part of this requirement, he had to fill out a "Residency Affidavit," which in turn required him to affirm that South Dakota is his state of residence and that he intends on returning to South Dakota after traveling. *See* Docket 20-1 at 1. He then cites SDCL § 12-1-4, a provision that establishes the criteria for determining an individual's residence for voting purposes. It provides: "[a] person who has left home and gone into another state or territory or county of this state for a temporary purpose only has not changed his or her residence." SDCL § 12-1-4. Putting his affidavit together with SDCL § 12-1-4, he reasons that SDCL § 37-24-41(14)(c) applies to him because he declared himself to be a

25

resident of South Dakota, he plans on returning to South Dakota eventually, he is a legal resident of South Dakota, and he is eligible to vote in South Dakota.

South Dakota law may *treat* Lapin as a South Dakota resident for purposes of allowing Lapin to obtain a South Dakota's Driver's License and to vote. But the statute at issue in this case, § 37-24-41(c), provides no evidence that the South Dakota Legislature wished to import the same loose definition of resident. In fact, the South Dakota Legislature has done the opposite, given its instruction to interpret words "in their ordinary sense" unless it has otherwise defined such words. SDCL § 2-14-1. And because neither SDCL § 37-24-41(14)(c) nor any surrounding provisions define the term resident, and the ordinary sense of the word resident does not include a self-admitted travelling digital nomad who has not physically lived in South Dakota for any significant time, the court rejects Lapin's argument that he is a resident for purposes of his claims.

Lapin also argues that his "domicile" is South Dakota. *See* Docket 19 at 6-9. But the statute does not refer to domicile—it refers to "resident." *See* SDCL § 37-24-41(14)(c). As the South Dakota Supreme Court has explained, "[r]esidence and domicile are not interchangeable concepts." *State ex rel. Jealous of Him v. Mills*, 627 N.W.2d 790, 793 (S.D. 2001). While residence "signifies living in [a] particular locality," domicile means "living in that locality with intent to make it a fixed and permanent home." *See In Re G.R.F.*, 569 N.W.2d 29, 33 n. 4 (S.D. 1997) (quoting Black's Law Dictionary 485 (6th ed.

1990)). If anything, establishing domicile is more difficult, because not only does an individual have to prove he is living in the relevant location, but such individual must also demonstrate an intent to make it his permanent home. *See id.* Notably, the South Dakota Supreme Court's discussion shows that both the terms residence and domicile require, at a minimum, that the individual *live* in the particular location. *See id.* Lapin does not live in South Dakota. Thus, Lapin's domicile argument fails.

In summary, Lapin does not live in South Dakota or spend any significant amount of time in South Dakota. Under an ordinary sense of the word resident, he cannot show that he is a resident of South Dakota. Lapin cannot show that the emails sent to his email addresses were South Dakota electronic mail addresses, and thus his claims asserting SDCL § 37-24-47 violations fail as a matter of law. There is no genuine dispute of material fact. The court dismisses Lapin's claims against EverQuote.

## III.    Preemption

EverQuote also argues that the federal CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*, preempts Lapin's South Dakota state-law claims. *See* Docket 14 at 12. Because the court dismisses Lapin's state-law claims against EverQuote, the court need not decide the preemption issue.

## IV.    Electronic Filing

Finally, Lapin asks this court to reconsider its decision to deny him leave to electronically file documents through CM/ECF. Docket 18. He argues that "sending mail is hard" and details the costs and lack of convenience for him to

27

send his filings through the mail. *See id.* at 18 at 2-4. He also argues he has less effective time to respond due to the amount of time it takes him to send his filings. *See id.* at 4. Alternatively, should the court deny him leave to file electronically, he seeks leave to file without a wet signature. *See id.* at 4-5.

After considering his motion, the court denies his motion to reconsider and denies his alternative request. While the court recognizes the challenges associated with having to mail filings, those challenges arise from Lapin's life-style decisions rather than circumstances beyond his control. Furthermore, after this order, the court does not anticipate many more filings from the parties.

## CONCLUSION

Based on the above, it is ORDERED that EverQuote's motion to dismiss Lapin's claims (Docket 13) is GRANTED. It is further ORDERED that Lapin's motion to reconsider (Docket 18) is DENIED. It is further ORDERED that Lapin identify and serve the sender "John Doe" within 21 days of this order, or else the court will dismiss Lapin's claims against John Doe without prejudice.

DATED February 17, 2023

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE